# United States Court of Appeals
## For the First Circuit

No. 13-1215

MANUEL ORDONEZ-QUINO,

Petitioner,

v.

ERIC H. HOLDER, JR., UNITED STATES ATTORNEY GENERAL,

Respondent.

PETITION FOR REVIEW OF AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS

Before

Torruella, Howard, and Thompson,
Circuit Judges.

Nancy J. Kelly, John Willshire Carrera, and Harvard Immigration & Refugee Clinic, on brief for Petitioner.
Dara S. Smith, Trial Attorney, Office of Immigration Litigation, Stuart F. Delery, Assistant Attorney General, Civil Division, and David V. Bernal, Assistant Director, Office of Immigration Litigation, on brief for Respondent.

July 23, 2014

**THOMPSON, <u>Circuit Judge</u>.** Petitioner Manuel Ordonez-Quino seeks review of a Board of Immigration Appeals' ("BIA") decision affirming an Immigration Judge's ("IJ") denial of his requests for asylum, withholding of removal, and protection under the United Nations Convention Against Torture. Among other things, he says the BIA's and IJ's determinations that he did not demonstrate past persecution on account of a protected ground were not supported by substantial evidence. Because we agree, we grant his petition and remand for further proceedings.

## I. Facts

We take the facts primarily from Ordonez-Quino's affidavit and testimony before the IJ, who found him credible, supplementing with some history for context. <u>See</u> <u>Ayala</u> v. <u>Holder</u>, 683 F.3d 15, 16 (1st Cir. 2012).

Ordonez-Quino was born in Zacualpa, Department of Quiché, Guatemala, on December 4, 1974. He is an indigenous Mayan Quiché. His native language is Quiché; he speaks very little Spanish.

Ordonez-Quino grew up during the most violent period of the brutal civil war that ravaged Guatemala from 1962 through 1996. In his affidavit and testimony, he related haunting childhood memories of the Guatemalan military's attacks on his family and their community. He said the Guatemalan government singled them out for persecution because of their indigenous race and ethnicity, their real and imputed political opinions, and their membership in

various social groups. During the attacks, he said, the military "shot at us, bombed us, destroyed our homes[,] and killed our people. I witnesse[d] many terrible things."

In 1980, during one such attack, a military helicopter dropped a bomb next to Ordonez-Quino and his father. Ordonez-Quino was only five or six years old. His father was trying to carry him to safety in the surrounding mountains when the nearby explosion knocked Ordonez-Quino to the ground. His father scooped him back up and ran into hiding, but the damage was done. Either as a result of the explosion or the fall, Ordonez-Quino suffered a severe illness, experiencing high fevers and extreme headaches for days. Because soldiers controlled the area, his parents could not seek medical attention and instead applied traditional remedies. Due to his injuries, Ordonez-Quino ultimately became almost completely deaf in both ears.

From that time forward, Ordonez-Quino's hearing loss affected him deeply. Because he could not hear, he lost his ability to speak clearly. It was difficult for him to communicate and develop relationships. He struggled to learn at the same pace as his peers. He was more vulnerable to violence because he could not hear the onset of military raids.

In the years that followed, soldiers continued to victimize Ordonez-Quino's community. At some point, his family's home and lands were destroyed. To survive, they went to work at a

farm on the coast of Guatemala. They all "worked very hard and lived very hard lives," but Ordonez-Quino suffered more because he could not understand Spanish or hear what his supervisors yelled at him. He says he "live[d] in constant anxiety and fear."

Some time later, Ordonez-Quino went to work in the textile mills in Guatemala City, where he was often mistreated because he could not hear or understand Spanish. During this period, his parents helped him arrange a marriage to a Quiché woman from his hometown. They later had a daughter together.

While he was in Guatemala City, Ordonez-Quino reports that he was repeatedly targeted by racist gangs because of his Quiché ethnicity. Again, his inability to hear or to understand Spanish put him in greater danger because he could not hear the gangs' threats or detect their approach.

Ordonez-Quino left Guatemala City after a violent gang attack in 2005, when gang members "started beating [him] as if they were going to kill [him]." While fleeing the gang, he ran into a barbed wire fence, causing permanent scars to his head and arm.

Fearing that he might not be able to escape if he were attacked again, Ordonez-Quino returned briefly to his hometown where he hid in his family's home. He came to the United States soon after because his family warned him it was not safe to stay in Guatemala. Today, his family tells him not to return to Guatemala due to ongoing violence against the Mayan Quiché community.

## II. Administrative Proceedings

Ordonez-Quino entered the United States through Mexico without inspection in July 2005. He made his way to Providence, Rhode Island to live with family members, and he found work at the Michael Bianco factory in New Bedford, Massachusetts.

On March 6, 2007, U.S. Immigration and Customs Enforcement raided the factory and detained Ordonez-Quino, along with over 300 other workers. The next day, the government issued a Notice to Appear, charging Ordonez-Quino with removability under 8 U.S.C. § 1182(a)(6)(A)(i) as an alien who had entered the United States without inspection or parole.[1]

On October 4, 2010, Ordonez-Quino appeared before an IJ in Boston, Massachusetts, seeking (1) asylum pursuant to 8 U.S.C. § 1158; (2) withholding of removal pursuant to 8 U.S.C. § 1231(b)(3); and (3) protection under the Convention Against Torture pursuant to 8 C.F.R. §§ 1208.16-18. Ordonez-Quino had great difficulty testifying because he could not hear his

---

[1] Ordonez-Quino was taken first to Fort Devens, Massachusetts, and then transferred to a detention facility in El Paso, Texas. On March 22, 2007, he appeared before an IJ in El Paso without counsel, without a Quiché translator, and without hearing assistance. The IJ ordered him removed in short order. Ordonez-Quino subsequently obtained counsel and appealed the IJ's decision, arguing he had not received a full and fair hearing, in violation of his due process rights. Both Ordonez-Quino and the Department of Homeland Security moved to remand his case to the IJ, and the BIA acquiesced. He later applied for and was granted a change of venue to Boston, Massachusetts.

attorney's or the IJ's questions well, despite the assistance of a hearing aid.[2]

In addition to his testimony and personal affidavit, Ordonez-Quino submitted the following materials to the IJ: the testimony and affidavit of a doctor verifying Ordonez-Quino's hearing impairment and noting his improvement with a hearing aid; the report of Guatemala's Commission for Historical Clarification ("Historical Clarification Report" or the "Report"), which, inter alia, found that the Guatemalan military committed acts of genocide against indigenous Guatemalans in several regions — including Ordonez-Quino's hometown of Zacualpa — during the Guatemalan Civil War;[3] decisions by the U.S. Courts of Appeals for the Second and Ninth Circuits addressing asylum claims brought by indigenous

---

[2] Ordonez-Quino obtained one hearing aid in the United States prior to appearing before the IJ.  He could not afford a second one, but he says he hopes to get another if he is permitted to stay in the United States.

[3] Comm'n of Historical Clarification, Guatemala Memory of Silence: Report of the Commission for Historical Clarification, Conclusions and Recommendations, Conclusions, ¶¶ 38-41 (1999), available at http://www.aaas.org/sites/default/files/migrate/uploads/mos_en.pdf ("Historical Clarification Report" or the "Report").  The Commission was established through the June 1994 Oslo Accord "to clarify with objectivity, equity[,] and impartiality, the human rights violations and acts of violence connected with the armed confrontation that caused suffering among the Guatemalan people," during the civil war. Id. at Prologue, 11.

Guatemalans;[4] several documents describing ongoing discrimination against Mayans in Guatemala; numerous reports and articles issued by the U.S. State Department and prominent human rights organizations detailing the history of violence and recent human rights violations against Mayans in Guatemala; and several documents about gang violence in Guatemala.

After the hearing, the IJ denied Ordonez-Quino's requests for relief and ordered him removed. Though the IJ found Ordonez-Quino's testimony credible and excused his failure to seek

---

[4] Those cases were: Perez Calmo v. Mukasey, 267 F. App'x 640 (9th Cir. 2008) (unpublished) (remanding IJ's denial of asylum because (1) petitioner's failure to show persecution was directed specifically at her did not necessarily preclude finding of past persecution, and (2) substantial evidence did not support IJ's finding of no nexus between soldiers' invasion of petitioner's village and a protected ground); Hernandez-Ortiz v. Gonzales, 496 F.3d 1042 (9th Cir. 2007) (remanding IJ's denial of asylum and withholding of removal because (1) IJ's adverse credibility findings were not supported by substantial evidence, and (2) IJ failed to consider harm petitioners and family suffered from perspective of small children); Jorge-Tzoc v. Gonzales, 435 F.3d 146 (2d Cir. 2006) (per curiam) (remanding IJ's denial of asylum because IJ failed (1) to take entire record into account and (2) to consider harm petitioner suffered cumulatively and from perspective of small child); and Velasquez v. Ashcroft, 81 F. App'x 673 (9th Cir. 2003) (unpublished) (remanding IJ's denial of asylum and withholding of removal because IJ failed to consider whether violence was committed against petitioner by actors the government was unwilling or unable to control).

asylum before the one-year filing deadline,[5] the IJ concluded that Ordonez-Quino did not qualify for asylum because he had not demonstrated past persecution or a well-founded fear of future persecution on account of a protected ground.

As for past persecution, the IJ found that the Guatemalan military attacked Ordonez-Quino's community during the war because they thought there were guerrillas within or nearby, not because the community was Mayan Quiché. While the IJ acknowledged that racism may have informed the military's beliefs about the community, he said racism itself was not the reason for bombing in or near the villages, and "[t]he purpose of the bombing was not to destroy the Mayan Quich[é] community." The IJ further found no evidence that Ordonez-Quino was later accosted by gangs because of his Mayan Quiché identity. Accordingly, the IJ held that Ordonez-Quino had not established the required nexus between the past harm he suffered and a protected ground.

As for fear of future persecution, while the IJ acknowledged that the Mayan Quiché population continues to suffer pervasive discrimination in Guatemala, he found that their present mistreatment does not rise to the level of persecution. Moreover,

---

[5] The IJ excused Ordonez-Quino's failure to apply for asylum before the one-year mark because Ordonez-Quino's "hearing loss with the resultant inability to communicate, as well as the possibility of some neurological damage resulting from his inability to hear and to learn . . . constitute[d] exceptional circumstances relating to the delay in his having filed his application for asylum." The government has not challenged this decision.

though Ordonez-Quino might fear further violence, the IJ said he had not shown he would be targeted by gangs or others in the future on account of a protected ground. In fact, family members who share his protected traits are living in Guatemala safely.

Accordingly, the IJ held that Ordonez-Quino was not eligible for asylum. He likewise found that Ordonez-Quino was not eligible for relief under the more stringent "clear probability of persecution" standard for withholding of removal, or for protection under the Convention Against Torture.

Ordonez-Quino appealed the IJ's decision to the BIA. He challenged the IJ's finding of no nexus between the past harm he suffered and a protected ground, and he argued he was eligible for asylum based both on past persecution and a well-founded fear of future persecution. He also expressly requested a discretionary grant of humanitarian asylum based on the severity of the past persecution he had experienced and the serious harm he would suffer if returned to Guatemala, in case the BIA found that changed circumstances in Guatemala undercut the reasonableness of his fear of future persecution.

On January 10, 2013, the BIA affirmed the IJ's decision in a brief opinion. First, the BIA agreed that Ordonez-Quino had not established a sufficient link between the past harms he suffered and a protected ground to qualify for asylum. Second, it found that the harms Ordonez-Quino said he experienced in the past

did not amount to persecution.  Third, the BIA said that even if Ordonez-Quino had established past persecution on account of a protected ground, changed country conditions would have rebutted his claim to a well-founded fear of future persecution.

Finally, the BIA found that Ordonez-Quino had waived any claim to humanitarian asylum by not specifically raising it before the IJ.  It went on to say that even if Ordonez-Quino had not waived this claim, Ordonez-Quino was not eligible for humanitarian asylum because he had not established past persecution.  In a footnote, the BIA added:

> Even if [Ordonez-Quino] had shown that his injuries during the civil war were on account of a protected ground sufficient to establish past persecution, [Ordonez-Quino's] case would not warrant humanitarian asylum based on the special considerations discussed in Matter of Chen, [20 I. & N. Dec. 16, 18-19 (BIA 1989)].

This timely appeal followed.

### III. Discussion

Before us, Ordonez-Quino contends that the BIA's and IJ's determinations that he did not establish past persecution on account of his race, ethnicity, and/or imputed political opinion were unsupported by substantial evidence.  He further argues that the BIA committed legal error by treating humanitarian asylum as a form of relief that an applicant must request independent of a

-10-

past-persecution-based asylum claim in order to preserve it.[6]  We address each of his arguments in turn.

## A. Standard of Review

We usually review decisions of the BIA, not the IJ. Ivanov v. Holder, 736 F.3d 5, 11 (1st Cir. 2013).  But where, as here, "'the BIA both adopts the findings of the IJ and discusses some of the bases for the IJ's decision, we have authority to review the decisions of both the IJ and the BIA.'"  Romilus v. Ashcroft, 385 F.3d 1, 5 (1st Cir. 2004) (quoting Chen v. Ashcroft, 376 F.3d 215, 222 (3d Cir. 2004)); see id. ("[W]here the BIA's decision adopts portions of the IJ's opinion, we review those portions of the IJ's opinion that the BIA has adopted."); see also Jianli Chen v. Holder, 703 F.3d 17, 21 (1st Cir. 2012) ("[W]here, as here, the BIA adopts portions of the IJ's findings while adding its own gloss, we review both the IJ's and the BIA's decisions as a unit."); Cabas v. Holder, 695 F.3d 169, 173 (1st Cir. 2012) ("Because the BIA adopted in part the IJ's decision . . . but also

---

[6] Ordonez-Quino also says the BIA erred as a matter of law by not recognizing imputed political opinion as a basis for asylum. If that is indeed what the BIA has done here, we agree it would be error.  See Singh v. Mukasey, 543 F.3d 1, 6 (1st Cir. 2008) ("[A]n imputed political opinion, whether correctly or incorrectly attributed, may constitute a reason for political persecution within the meaning of the [Immigration and Nationality] Act." (internal quotation marks omitted)).  But because we find the IJ and BIA erred by not finding Ordonez-Quino eligible for asylum based on the grounds of race and ethnicity, we need not deal with this argument.  We likewise need not discuss Ordonez-Quino's arguments that the BIA and IJ erred by denying his requests for withholding of removal and Convention Against Torture relief.

provided additional analysis, we review both decisions.").

We review the BIA's and IJ's interpretations of law <u>de novo</u>, "subject to appropriate principles of administrative deference." <u>Larios</u> v. <u>Holder</u>, 608 F.3d 105, 107 (1st Cir. 2010). We review their findings of fact — including whether persecution occurred on account of a protected ground — "under the familiar and deferential substantial evidence standard." <u>Ivanov</u>, 736 F.3d at 11. We will respect their findings so long as they are "'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" <u>Larios</u>, 608 F.3d at 107 (quoting <u>I.N.S.</u> v. <u>Elias-Zacarias</u>, 502 U.S. 478, 481 (1992)). "However, 'our deference is not unlimited,'" and we must reject the BIA's and IJ's findings if "'we cannot conscientiously find that the evidence supporting them is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to [their] view[s].'" <u>Ivanov</u>, 736 F.3d at 11 (quoting <u>Kartasheva</u> v. <u>Holder</u>, 582 F.3d 96, 105 (1st Cir. 2009)) (internal brackets omitted); <u>see also</u> <u>Mukamusoni</u> v. <u>Ashcroft</u>, 390 F.3d 110, 119 (1st Cir. 2004). We will reverse if the record would compel a reasonable fact-finder to reach a contrary conclusion. <u>Vasili</u> v. <u>Holder</u>, 732 F.3d 83, 89 (1st Cir. 2013) (quoting <u>Chhay</u> v. <u>Mukasey</u>, 540 F.3d 1, 5 (1st Cir. 2008)).

**B. Asylum**

To be eligible for asylum, a petitioner must show he is unwilling or unable to return to his home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."  8 U.S.C. § 1101(a)(42)(A); see id. § 1158(b)(1)(B)(i); Ivanov, 736 F.3d at 11.  Proof of past persecution creates a presumption of a well-founded fear of future persecution.  8 C.F.R. § 1208.13(b)(1); Ivanov, 736 F.3d at 11. The government may rebut this presumption by demonstrating, by a preponderance of the evidence, that "[t]here has been a fundamental change in circumstances such that the [petitioner] no longer has a well-founded fear of persecution," or that the petitioner "could avoid future persecution by relocating to another part of [his] country of nationality . . . and under all the circumstances, it would be reasonable to expect [him] to do so."  8 C.F.R. § 1208.13(b)(1)(i)(A)-(B).

**1. Past Persecution**

Persecution is a fluid term, not defined by statute. Ivanov, 736 F.3d at 11 (quoting Lopez de Hincapie v. Gonzales, 494 F.3d 213, 217 (1st Cir. 2007)).  We know it requires that "the sum of [a petitioner's] experiences . . . add up to more than ordinary harassment, mistreatment, or suffering."  Lopez de Hincapie, 494 F.3d at 217.  It "normally involves 'severe mistreatment at the

hands of [a petitioner's] own government,'" or "'non-governmental actors . . . in league with . . . or . . . not controllable by the government.'" Ayala v. Holder, 683 F.3d 15, 17 (1st Cir. 2012) (quoting Silva v. Ashcroft, 394 F.3d 1, 7 (1st Cir. 2005)). But within these broad parameters, courts usually assess whether harm rises to the level of persecution on a case-by-case basis. Sok v. Mukasey, 526 F.3d 48, 53 (1st Cir. 2008) (quoting Aguilar-Solis v. I.N.S., 168 F.3d 565, 570 (1st Cir. 1999)).

For purposes of asylum, a petitioner must demonstrate that the harm he experienced occurred "on account of" a statutorily protected ground. Ivanov, 736 F.3d at 12. After passage of the REAL ID Act of 2005, this means a protected ground must be at least "'one central reason' for the mistreatment," and it must not be "'incidental, tangential, superficial, or subordinate to another reason for harm.'"[7] Singh v. Mukasey, 543 F.3d 1, 5 (1st Cir. 2008) (quoting In re J-B-N- & S-M-, 24 I. & N. Dec. 208, 214 (BIA 2007)); see 8 U.S.C. § 1158(b)(1)(B)(i). A petitioner need not provide direct proof of motive, but he must put forth "some evidence on the subject due to its importance in the statutory scheme." Singh, 543 F.3d at 5 (citing Babani v. Gonzales, 492 F.3d 20, 22-23 (1st Cir. 2007)).

---

[7] The REAL ID Act of 2005 applies to all applications that, like Ordonez-Quino's, were filed on or after May 11, 2005. See 8 U.S.C. § 1158 note (effective date of 2005 amendment); Moreno v. Holder, 749 F.3d 40, 43 (1st Cir. 2014).

**a. Nexus to a Protected Ground**

Ordonez-Quino says the IJ's determination that he did not establish the requisite nexus between the harms he suffered and his Mayan Quiché race and ethnicity was not supported by substantial evidence. We agree. In reaching this conclusion, it appears that the IJ — and the BIA following suit — ignored or unreasonably interpreted crucial documentary evidence linking Ordonez-Quino's experiences to his protected Mayan Quiché identity.

With respect to the attack that caused Ordonez-Quino to lose his hearing, the IJ said:

> The bombing which occurred in 1980 and during the period of the civil war cannot be found to be precipitated by the Guatemalan army bombing the Mayan Quich[é] population. Rather, the bombing attacks were taking place in or near these communities because it was believed that there were guerrillas in or near these communities.
>
> To the extent that a certain racism existed at that time, it still was not a basis for bombing in or near the Mayan Quich[é] villages. Rather, the racism was the basis, however founded or unfounded, of the Guatemalan military believing that the Mayan Quich[é] community was sympathetic to the guerrilla cause and were harboring guerrillas.
>
> I find based on the documentary evidence that although [Ordonez-Quino] was injured and suffered hearing loss because of the bombing raids that the bombing raids were not directed at the Mayan Quich[é] community per se, but, rather, they were on account of the civil war which was going on at the time and on the basis of the Guatemalan army seeking to ferret out and destroy the guerrilla enemies. The purpose of the bombing was not to destroy the

Mayan Quich[é] community.

The IJ further found "that the tragic damage to [Ordonez-Quino's] ears as a result of the bombing during the civil war in 1980 [was] as a result of the civil war and general conditions of strife and violence which existed in Guatemala at the time."

The BIA agreed with the IJ's take, reiterating his finding that "all Mayans were targeted because of their suspected support of the guer[r]illas," and saying Ordonez-Quino "ha[d] not shown that he was targeted based on ethnicity rather than being a victim of violence incident to the civil war."

However, the Historical Clarification Report, as well as other documentary evidence Ordonez-Quino submitted, tells a different story. According to the Report, racism was an underlying cause of the Guatemalan Civil War and "a basic explanatory factor for the indiscriminate nature and particular brutality with which military operations were carried out against hundreds of Mayan communities." Historical Clarification Report, Conclusions, ¶¶ 12, 33. "[D]uring the bloodiest years of the confrontation," "Mayan communities . . . became a military objective." Id. at Conclusions, ¶ 62. Eighty-three percent of the war's identified victims were Mayan. Id. at Conclusions, ¶ 1.

Though the army did, as the IJ reported, associate Mayan communities with guerrilla-supporters, "in the majority of cases, the identification of Mayan communities with the insurgency was

-16-

intentionally exaggerated by the State, which, based on traditional

racist prejudices, used this identification to eliminate any

present or future possibilities of the people providing help for,

or joining, an insurgent project." Id. at Conclusions, ¶ 31.

> The consequence of this manipulation . . . was massive and indiscriminate aggression directed against communities independent of their actual involvement in the guerrilla movement and with a clear indifference to their status as a non-combatant civilian population. The massacres, scorched earth operations, forced disappearances and executions of Mayan authorities, leaders[,] and spiritual guides, were not only an attempt to destroy the social base of the guerrillas, but above all, to destroy the cultural values that ensured cohesion and collective action in Mayan communities.

Id. at Conclusions, ¶ 32. Furthermore, the army's inflated

perception of Mayans as guerrilla allies "contributed to increasing

and aggravating the human rights violations perpetrated against

them, demonstrating an aggressive racist component of extreme

cruelty that led to the extermination en masse[] of defen[s]eless

Mayan communities purportedly linked to guerrillas — including

children, women[,] and the elderly." Id. at Conclusions, ¶ 85.

Considering these repeated "destructive acts, directed

systematically against groups of the Mayan population," including

"against minors who could not possibly have been military targets,"

the Historical Clarification Report found that "the only common

denominator" among victims was membership in a Mayan ethnic group,

and the Guatemalan military's acts were committed "with intent to

-17-

destroy" these groups, "in whole or in part."  Id. at Conclusions, ¶ 111.  The Report ultimately concluded that the Guatemalan State had "committed acts of genocide against groups of Mayan people" in four regions, including Ordonez-Quino's hometown of Zacualpa, between 1981 and 1983.[8]  Id. at Conclusions, ¶¶ 110, 122.

Thus, while the IJ correctly noted that Mayan communities like Ordonez-Quino's were targeted during the civil war in part because of their real or imagined connection to guerrilla forces, the documentary evidence does not support his finding that the purpose of such attacks "was not to destroy the Mayan . . . community."  In fact, that was precisely the military's aim, as explicitly found by Guatemala's own Historical Clarification Commission, and consistent with numerous documentary sources in the

---

[8] The Report adopted the United Nations' definition of genocide as:

[A]ny of the following acts committed with intent to destroy, in whole or in part, a national, ethnic[], racial[,] or religious group, . . . :
a)   Killing members of the group;
b)   Causing serious bodily or mental harm to members of the group;
c)   Deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part;
d)   Imposing measures intended to prevent births within the group;
e)   Forcibly transferring children of the group to another group.

Historical Clarification Report, Conclusions, ¶ 109 (citing U.N. Convention on the Prevention and Punishment of the Crime of Genocide, art. 2, approved Dec. 9, 1948, 78 U.N.T.S. 277 (entered into force Jan. 12, 1951)).

record. Furthermore, the evidence does not support the IJ's conclusion that the attacks on Ordonez-Quino's village were merely "a result of the civil war and general conditions of strife and violence which existed in Guatemala at the time." Rather, the evidence shows that Ordonez-Quino's community and others were intentionally targeted by government forces during the war because of their Mayan identity. Cf. Arevalo-Giron v. Holder, 667 F.3d 79, 82-83 (1st Cir. 2012) (finding agency's determination that Guatemalan petitioner's father was "a random casualty of the civil war" was supported by substantial evidence where petitioner did not allege father was a member of the army, the guerrillas, or the civil patrol — or a targeted racial or ethnic group).

We do not require an asylum applicant to demonstrate that he was singled out only due to his protected trait; rather, he must show that such characteristic was "one central reason" for his abuse. Singh, 543 F.3d at 5; see Ivanov, 736 F.3d at 14-15 (applying pre-REAL ID Act standard). Rarely will an applicant know the "exact motivation" of his persecutors — especially when he was victimized as a young child — and, "'of course, persecutors may often have more than one motivation.'" See Ivanov, 736 F.3d at 15 (alteration omitted) (quoting Sompotan v. Mukasey, 533 F.3d 63, 69 (1st Cir. 2008)). Ordonez-Quino has amply shown that his Mayan Quiché identity was "at least one central reason" why he and his community were targeted by the Guatemalan army, and he need show no

-19-

more than that.  Thus, we find that the IJ's conclusion, echoed by the BIA, that Ordonez-Quino did not demonstrate an adequate nexus between the harms he experienced during the civil war and a protected ground is not supported by substantial evidence "'when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the [IJ's] view.'"[9] Ivanov, 736 F.3d at 11 (quoting Kartasheva, 582 F.3d at 105). Consequently, it must be vacated.[10]

### b. Degree of Harm

Because the IJ found that Ordonez-Quino had not met the nexus requirement, he did not decide whether the harms Ordonez-Quino experienced as a Mayan Quiché in Guatemala rose to the level of past persecution.  The BIA, on the other hand, proceeded to find that, in addition to lacking the requisite nexus, Ordonez-Quino's "account of being discriminated against due to his ethnicity [did] not amount to past persecution."  "Moreover," the BIA said, "the isolated nature of both the civil war-related bombing and the respondent's incident with a gang does not support a claim of asylum."  We hold that this finding also was not supported by

---

[9] This is not the first time that an IJ has ignored the Historical Clarification Report's findings at his or her peril. See Jorge-Tzoc, 435 F.3d at 149-50 (finding, inter alia, that IJ erred when she failed to take into account Report's findings).

[10] We do not disturb the IJ's finding that Ordonez-Quino did not establish a nexus between the 2005 gang attack and his Mayan Quiché identity.  However, on remand the agency may wish to reconsider this determination after digging deeper in the record.

substantial evidence in the record.

As a refresher, to constitute persecution, "the sum of [a petitioner's] experiences must add up to more than ordinary harassment, mistreatment, or suffering." Lopez de Hincapie, 494 F.3d at 217; see Nikijuluw v. Gonzales, 427 F.3d 115, 120 (1st Cir. 2005) ("[P]ast persecution requires that the totality of a petitioner's experiences add up to more than mere discomfiture, unpleasantness, harassment, or unfair treatment."). The abuse must also "have reached a fairly high threshold of seriousness, as well as some regularity and frequency." Ivanov, 736 F.3d at 11 (quoting Rebenko v. Holder, 693 F.3d 87, 92 (1st Cir. 2012)) (internal quotation mark omitted). But within these broad guideposts, we usually assess whether a particular petitioner was persecuted on a case-by-case basis. See Sok, 526 F.3d at 53 (quoting Aquilar-Solis, 168 F.3d at 570).

As several of our sister circuits have recognized, "age can be a critical factor" in determining whether a petitioner's experiences cross this threshold. Liu v. Ashcroft, 380 F.3d 307, 314 (7th Cir. 2004); see, e.g., Hernandez-Ortiz v. Gonzales, 496 F.3d 1042, 1045 (9th Cir. 2007); Jorge-Tzoc v. Gonzales, 435 F.3d 146, 150 (2d Cir. 2006) (per curiam). Where the events that form the basis of a past persecution claim were perceived when the petitioner was a child, the fact-finder must "look at the events from [the child's] perspective, [and] measure the degree of [his]

injuries by their impact on [a child] of [his] age[]." Hernandez-Ortiz, 496 F.3d at 1046. The "'harm a child fears or has suffered . . . may be relatively less than that of an adult and still qualify as persecution.'" Liu, 380 F.3d at 314 (quoting Jeff Weiss, U.S. Dep't of Justice, Guidelines for Children's Asylum Claims, 1998 WL 34032561, at *14 (Dec. 10, 1998)). Moreover, harm to a child's family or community — upon whom the child depends — may contribute to a finding of persecution against the child himself. See Jorge-Tzoc, 435 F.3d at 150; see also Hernandez-Ortiz, 496 F.3d at 1045-46.

Ordonez-Quino's past persecution claim is primarily based on harms he experienced as a Mayan Quiché child growing up during the Guatemalan Civil War. Those harms include numerous attacks by Guatemalan soldiers on his village — one of which left him almost completely deaf and stunted his development — as well as the ongoing deprivation, relocations, and discrimination he and his family faced over the years.[11]

The BIA appears to have committed two errors in assessing Ordonez-Quino's past persecution claim. First, rather than considering the harms Ordonez-Quino experienced cumulatively, the BIA considered only two of the incidents Ordonez-Quino described:

_____

[11] Later, Ordonez-Quino says he was threatened and beaten by gangs as an adult in Guatemala City, but we will not consider these incidents because we have not disturbed the IJ's and BIA's findings that these incidents were not linked to a protected ground.

-22-

the 1980 bombing that resulted in his hearing loss, and the 2005 gang attack that precipitated Ordonez-Quino's departure from Guatemala.  By describing the bombing as an "isolated" incident, the BIA implicitly rejected (without explanation) Ordonez-Quino's description of the plural "attacks" waged against his village during the civil war and the trauma he and his family suffered as a result, thereby again ignoring crucial evidence in the record.

Second and relatedly, there is no indication that the BIA considered the harms Ordonez-Quino suffered throughout this period from his perspective as a child, or that it took the harms his family suffered into account.  Ordonez-Quino was very young at the time of the attacks on his village.  He remembers "being extremely frightened" and "witness[ing] many terrible things" as soldiers shot at, bombed, and killed members of his community.  At age five or six, he was horrifically injured in a bombing attack that resulted in a lengthy, severe illness and permanent, near-total hearing loss.  He says that "not being able to hear was . . . terrifying."  This injury altered the course of Ordonez-Quino's life dramatically — he lost the ability to speak clearly, had difficulty learning, and became more vulnerable to violence.  His family, upon whom he was totally dependent, suffered greatly during the attacks as well and eventually was forced to relocate for survival.  This combination of circumstances — bombing attacks, permanent injury, the loss of a home, the razing of lands, and

internal displacement lasting years — could certainly support a finding of past persecution for an adult. Such a string of events even more strongly supports a finding of past persecution for a small child, whose formative years were spent in terror and pain.

Because the BIA failed to address the harms Ordonez-Quino and his family experienced cumulatively and from the perspective of a child, its determination is not supported by substantial evidence in the record. Thus, we must vacate the BIA's determination that the harms Ordonez-Quino and his family suffered did not rise to the level of past persecution. See Jorge-Tzoc, 435 F.3d at 150.

On remand, bearing these principles in mind, the agency must determine whether the harms Ordonez-Quino suffered in Guatemala on account of his Mayan identity meet the standard of past persecution, viewed in the aggregate and from the perspective of a child of Ordonez-Quino's age when these events occurred. We further note that though the agency's review may properly account for both the cumulative nature of these events and Ordonez-Quino's youth, correction of either error could prove a sufficient basis for a finding of past persecution on remand.

## 2. Well-Founded Fear of Future Persecution

After finding that Ordonez-Quino had not demonstrated past persecution on account of a protected ground, the IJ went on to find that Ordonez-Quino also failed to establish a well-founded fear of future persecution on account of a protected ground. For

-24-

this conclusion, he relied on the ongoing presence of Ordonez-Quino's family members — who share his protected traits — in their village. He further said that any gang violence Ordonez-Quino feared in the future would not be because of his protected characteristics, "but rather only in furtherance of [the gang's] reprehensible criminality."

On remand, if the agency determines that the harm Ordonez-Quino suffered as a Mayan Quiché child in Guatemala rose to the level of past persecution, a different analysis will be required. As we set out above, past persecution creates a presumption of future persecution, which the government can rebut by demonstrating that there has been a fundamental change of circumstances in Guatemala such that the applicant's fear can no longer be considered well-founded.[12] 8 C.F.R. § 1208.13(b)(1)(i)(A). To overcome the presumption, the government must show that "'changes in country conditions . . . have negated the particular applicant's well-founded fear of persecution,'" taking his individual situation into account. Hernandez-Barrera v. Ashcroft, 373 F.3d 9, 24 (1st Cir. 2004) (quoting Fergiste v. I.N.S., 138 F.3d 14, 18-19 (1st Cir. 1998)).

Unlike the IJ, after finding that Ordonez-Quino had not demonstrated past persecution on account of a protected ground, the

---

[12] The government can also rebut the presumption by showing Ordonez-Quino could avoid persecution by moving to another part of Guatemala and it would be reasonable to expect him to do so. 8 C.F.R. § 1208.13(b)(1)(i)(B).

BIA proceeded to hold that even if Ordonez-Quino had shown past persecution, changed country conditions would have rebutted his claim to a well-founded fear of future persecution. For support, the BIA cited this court's decision in <u>Palma-Mazariegos</u> v. <u>Gonzales</u>, 428 F.3d 30, 32 (1st Cir. 2005). That case treated the distinct issue of whether a Guatemalan petitioner had a reasonable fear of future harm based on his refusal to join the guerrilla forces. <u>Id.</u> at 33. The court there noted that evidence showed the guerrillas had been integrated into the government after the civil war and no longer engaged in militant activities. <u>Id.</u> at 35-36. As a result, the court found that the record supported the BIA's finding of changed conditions sufficient to rebut that petitioner's asserted fear of future harm. <u>Id.</u> at 37.

Ordonez-Quino, on the other hand, says he has a well-founded fear of future persecution based on his Mayan Quiché race and ethnicity. He provides significant documentation of ongoing systemic racism and human rights violations against the Mayan Quiché community. <u>See, e.g.</u>, U.S. Dep't of State, <u>2009 Human Rights Reports: Guatemala</u> §§ 5-6 (2010) (noting, <u>inter alia</u>, threats to and murders of indigenous leaders; pervasive discrimination against indigenous community; and land dispute where police evicted roughly 80 indigenous community members from their homes, burned their homes, and destroyed their crops); Guatemalan Human Rights Comm'n, <u>Guatemala Human Rights Review, January-</u>

-26-

<u>September 2007</u> 7 (2007) (describing violent evictions of indigenous families from native lands at hands of police officers and military personnel).

The BIA's quick dismissal of Ordonez-Quino's fear-of-future-persecution claim with a conclusory statement and an inapposite case citation, without any reference to the voluminous record, is not a finding supported by substantial evidence. <u>See</u> <u>Gailius</u> v. <u>I.N.S.</u>, 147 F.3d 34, 46 (1st Cir. 1998) ("In order for this court to conduct a proper substantial evidence review of the BIA's decision, the [BIA's] opinion must state with sufficient particularity and clarity the reasons for denial of asylum." (internal quotation marks omitted)). The BIA appears not to have made any attempt to assay the evidence of current conditions in Guatemala for Ordonez-Quino specifically, and thereby failed to undertake the type of particularized analysis that our standards demand. <u>See</u> <u>Hernandez-Barrera</u>, 373 F.3d at 25.

Accordingly, if the agency now finds that Ordonez-Quino has in fact demonstrated past persecution, it will need to determine whether the government has rebutted Ordonez-Quino's corollary presumption of a well-founded fear considering the evidence put forth in this record and his individual situation.

**3. Humanitarian Asylum**

Furthermore, if the agency finds both that Ordonez-Quino has established past persecution and that the government has

-27-

rebutted his fear of future persecution, Ordonez-Quino may nevertheless be able to obtain discretionary asylum relief based on past persecution alone under the "humanitarian exception." See Guerrero v. Holder, 667 F.3d 74, 79 n.5 (1st Cir. 2012) (citing 8 C.F.R. § 1208.13(b)(1)(iii)). This exception permits a decisionmaker to grant an asylum applicant's request for relief "in the absence of [a] well-founded fear of future persecution" if:

> (A)    The applicant has demonstrated compelling reasons for being unwilling or unable to return to the country arising out of the severity of the past persecution; or

> (B)    The applicant has established that there is a reasonable possibility that he or she may suffer other serious harm upon removal to that country.

8 C.F.R. § 1208.13(b)(1)(iii)(A)-(B); see also Matter of Chen, 20 I. & N. Dec. 16, 19 (BIA 1989).

To qualify for humanitarian asylum based on the severity of past persecution, an applicant must prove that he or she experienced "extraordinary suffering" in the past. Zarouite v. Gonzales, 424 F.3d 60, 64 (1st Cir. 2005). In other words, "an [applicant] must show past persecution so severe that repatriation would be inhumane." Tokarska v. I.N.S., 978 F.2d 1, 2 (1st Cir. 1992) (per curiam) (quoting Baka v. I.N.S., 963 F.2d 1376, 1379 (10th Cir. 1992)) (internal quotation marks omitted); see also Precetaj v. Holder, 649 F.3d 72, 77 (1st Cir. 2011) ("[T]he paradigm case is one in which so much abuse has been directed

-28-

against the victim that the suffering is projected into the future and that a return of the applicant to the place where the harm was inflicted would magnify the prior suffering.").

A showing of severe harm and the long-lasting effects of such harm, such as an ongoing or permanent disability, may support a discretionary grant of humanitarian asylum. See Jalloh v. Gonzales, 498 F.3d 148, 151 (2d Cir. 2007) (explaining that the agency requires a showing of both "'severe harm and the long-lasting effects of that harm'" to obtain humanitarian asylum (quoting In re N-M-A-, 22 I. & N. Dec. 312, 326 (BIA 1998))); Mohammed v. Gonzales, 400 F.3d 785, 801 (9th Cir. 2005) (recognizing female genital mutilation as "a particularly severe form of past persecution because of its many continuing effects"); Matter of Chen, 20 I. & N. Dec. at 18; cf. Gebru v. I.N.S., 173 F.3d 424 (4th Cir. 1999) (per curiam) (unpublished) (affirming denial of humanitarian asylum where petitioner "presented no evidence demonstrating that she suffers from physical and psychological disabilities like those shown in Matter of Chen"). For example, in Matter of Chen, the first BIA decision invoking humanitarian asylum, the BIA relied in part on the applicant's continuing physical disability — he had to wear a hearing aid due to injuries sustained when rocks were thrown at his head at a young age, was "always anxious and fearful, and [was] often suicidal" — in deciding to exercise discretion in the applicant's favor. 20 I.

& N. Dec. at 20-21.

Ordonez-Quino first specifically requested humanitarian asylum before the BIA, claiming eligibility based both on the severity of harm underlying his past persecution and the serious harm he would suffer if removed to Guatemala. In response, the BIA said Ordonez-Quino had waived his claim to humanitarian asylum because he had not explicitly raised it before the IJ. Alternatively, the BIA said that even if Ordonez-Quino had not waived his claim, he was not eligible for humanitarian asylum because he had not established past persecution on account of a protected ground. Even further, the BIA said, if Ordonez-Quino had made the requisite showing of past persecution and nexus, he still would not qualify for humanitarian asylum based on the considerations discussed in Matter of Chen.

Before us, Ordonez-Quino challenges each of these conclusions. The government, on the other hand, says we lack jurisdiction to review the BIA's denial of humanitarian asylum. In the alternative, it contends the BIA did not abuse its discretion in refusing to grant humanitarian asylum to Ordonez-Quino. It further advises that we need not address the BIA's waiver determination because we can uphold the BIA's decision on either of these two bases.

Because we are remanding Ordonez-Quino's case to determine whether he established past persecution on account of a

protected ground, we need not comment on the BIA's ultimate conclusions regarding his eligibility for humanitarian asylum. However, for the sake of clarity on remand, we make a few points.

First, we easily reject the government's jurisdictional argument. This court has, on numerous occasions, exercised its power to review agency decisions regarding applicants' requests for humanitarian asylum based on past persecution alone. See, e.g., Precetaj, 649 F.3d at 77-78; Waweru v. Gonzales, 437 F.3d 199, 205 (1st Cir. 2006); Zarouite, 424 F.3d at 64; Tokarska, 978 F.2d at 1-2. The government's citation to Ang v. Gonzales, 430 F.3d 50, 57-58 (1st Cir. 2005) — which dealt with an unrelated statute granting the Attorney General discretion to "parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission into the United States," 8 U.S.C. § 1182(d)(5)(A) — does not convince us that we lack power to review the agency's humanitarian asylum determinations.

Second, contrary to the BIA's assertion, Ordonez-Quino did not waive his claim to humanitarian asylum by not explicitly requesting it from the IJ apart from his overall past-persecution-based asylum claim. As the government explains, what we refer to as "humanitarian asylum" is not a separate form of relief created by the Immigration and Nationality Act. Rather, it is a

-31-

discretionary form of relief that may be granted to certain asylum seekers.[13]  See 8 C.F.R. § 1208.13(b)(1)(iii)(A)-(B).  Neither the BIA nor the government has cited any case — and we have found none — requiring an asylum seeker to request humanitarian asylum independent of other past-persecution-based asylum relief before the IJ in order to preserve his claim to humanitarian asylum before the BIA.[14]  The lone case the BIA cites in support of waiver — Matter of J-Y-C-, 24 I. & N. Dec. 260, 261 n.1 (BIA 2007) — does not deal with humanitarian asylum.  Rather, in that case, the BIA rejected an applicant's attempt to argue an entirely new basis for asylum for the first time on appeal, saying he was "eligible for asylum as a result of his mother's death . . . from an alleged forced sterilization procedure," when he had previously sought asylum based only on his religion.  Id.  Here, on the other hand, Ordonez-Quino has consistently asserted eligibility for asylum based on the past harm he experienced in Guatemala on account of his race and ethnicity.

---

[13] By way of illustration, we note, as did Ordonez-Quino, that there is no separate space in the asylum application, Form I-589, for an applicant to make a claim for "humanitarian asylum," as opposed to "regular" asylum.

[14] We have, however, found cases requiring an asylum applicant to request humanitarian asylum at the agency level — i.e., before the BIA or IJ — prior to asking this court to review the agency's denial of such relief.  See, e.g., Zarouite, 424 F.3d at 64; Velásquez v. Ashcroft, 342 F.3d 55, 59 (1st Cir. 2003), abrogated on other grounds by Bocova v. Gonzales, 412 F.3d 257, 266 (1st Cir. 2005).  But that's a different matter.

Finally, while we make no comment on the merits of Ordonez-Quino's humanitarian asylum claim, we note that the BIA's conclusory statement that his case "would not warrant humanitarian asylum based on the special considerations discussed in <u>Matter of Chen</u>," even if he had shown his injuries amounted to past persecution on account of a protected ground — without any discussion of the severity of the harms Ordonez-Quino suffered — would not withstand substantial evidence review. <u>See</u> <u>Gailius</u>, 147 F.3d at 46 (explaining that the BIA must state with sufficient particularity and clarity its reasons for denial of asylum for this court to conduct a proper substantial evidence review). Accordingly, if the agency finds upon remand that Ordonez-Quino has established past persecution but that the presumption of a well-founded fear of future persecution is rebutted, it must also determine whether the persecution Ordonez-Quino experienced — as well as the ongoing harm he suffers today due to his hearing disability and developmental difficulties, and any harm he might suffer upon returning to Guatemala — warrant a grant of humanitarian asylum.

## IV. Conclusion

For the foregoing reasons, the order of the BIA affirming the IJ's decision is vacated and the matter is <u>remanded</u> for proceedings consistent with this decision.

-33-