BARRON, Circuit Judge, concurring in part and dissenting in part.
I join the majority in rejecting Yolanda and Consuelo Olmos-Colaj's petition for review of their asylum and Convention Against Torture claims. In my view, however, we should vacate and remand the petition so that the Board of Immigration Appeals (BIA) may reconsider the petitioners' withholding of removal claims.
The BIA, without adopting the decision of the Immigration Judge (IJ), determined, among other things, that the IJ did not clearly err when it found that the petitioners had failed to meet their burden to show that they had experienced past persecution and that, in consequence, the petitioners were not entitled to a presumption of having a well-founded fear of future persecution. Accordingly, neither the BIA nor the IJ addressed whether, if the petitioners were entitled to that presumption, their withholding of removal claims should be denied.
The parties agree that we may uphold the IJ's finding that the petitioners did not meet their burden of showing that they had experienced past persecution-and thus the BIA's ruling upholding that finding by the IJ-only if the IJ's finding is supported by substantial evidence on the record as a whole.[3] But, as I will explain, I do not believe that finding is sustainable on this record, even under the deferential substantial evidence standard. I thus conclude that the petition must be vacated and remanded so that the BIA may give further consideration to those issues concerning the petitioners' withholding of removal claims that the agency has not yet addressed.
I.
To show that they are entitled to a presumption that they have a well-founded fear of future persecution based on their past persecution, the petitioners point to painful experiences that they endured as children during the Guatemalan Civil War and that they suffered as adults in Guatemala after that civil war ended. I thus now consider this evidence, which the IJ found to be credible.
*178 A.
We have recognized that, during the Guatemalan Civil War, "Mayan communities ... became a military objective." Ordonez-Quino v. Holder, 760 F.3d 80, 89 (1st Cir. 2014) (internal citations and alterations omitted); see also Perez Calmo v. Mukasey, 267 Fed.Appx. 640, 641 (9th Cir. 2008) ("Mayans, as a group, were identified by the Guatemalan army as guerrilla allies and were targeted for extinction." (internal citation omitted) ). And, here, the uncontradicted record shows that the petitioners, who are members of a Mayan ethnic group known as the Quiché, were displaced from their home during the war due to concerns for their safety after, also during the war, a number of aunts, uncles, and cousins were either killed, raped, or tortured and their father was forced to flee from their village.
It is true that, as the IJ noted, these petitioners, unlike the petitioner in Ordonez-Quino, were not themselves physically injured in the civil war and did not themselves personally view others being so injured, see 760 F.3d at 91-92. But, the petitioners rightly point out that we held in Ordonez-Quino that "[w]here the events that form the basis of a past persecution claim were perceived when the petitioner was a child, the fact-finder must 'look at the events from [the child's] perspective, [and] measure the degree of [his] injuries by their impact on [a child] of [his] age.' " Id. at 91 (quoting Hernandez-Ortiz v. Gonzales, 496 F.3d 1042, 1045 (9th Cir. 2007) (alterations in original)). And, we further emphasized in Ordonez-Quino that the BIA must take the "harms [a child's] family suffered into account" and consider them "from the perspective of a child" in determining whether those childhood experiences amounted to persecution. Id. at 92. Nor are we unique in adopting this context-sensitive approach to assessing whether childhood wartime experiences amount to persecution. See Jorge-Tzoc v. Gonzales, 435 F.3d 146, 150 (2d Cir. 2006) (concluding that where the petitioner had not personally been "victimized" by the killings that occurred in the course of a massacre in his Mayan village during the Guatemalan Civil War, "[b]ecause the IJ failed to take into account significant evidence and to address the harms [the petitioner] and his family incurred cumulatively and from the perspective of a small child," the BIA's finding on past persecution was not sustainable on a record that showed, among things, that the petitioner had been forced to relocate with his family due to the wartime violence in his village).
Thus, although the majority does not address this issue, in my view, the IJ erred by concluding, in effect, that the harm that the petitioners suffered during the civil war was too slight to constitute persecution because the petitioners did not endure harm as severe as that endured by the petitioner in Ordonez-Quino during that same war. We simply did not hold in Ordonez-Quino that the extreme harm suffered by the petitioner there constituted a threshold of wartime childhood trauma that must be met. And I cannot see how substantial evidence supports the conclusion that the traumatizing wartime experiences that the petitioners did credibly recount, which included their family's forced relocation to escape the extreme violence visited upon a number of close family members, would not engender in a child, at least presumptively, a well-founded fear of being persecuted in Guatemala in the future.
Of course, the harm that the petitioners suffered during the war must still have a nexus to their Quiché ethnicity. It is their membership in that "social group," after all, that grounds their past persecution claim. And the IJ did state in a somewhat *179 cryptic footnote that the harm that the petitioners suffered as children during the war was "attenuated" from their asserted protected identity. The IJ did not, however, appear to retreat in any clear way from its statement earlier in its opinion that it assumed "that the [petitioners] have established a sufficient nexus between the mistreatment that they suffered in Guatemala and their identity as indigenous Mayan women." Accordingly, I read the IJ-and thus the BIA in finding that the IJ did not clearly err[4] -to have assumed that the petitioners had satisfied the nexus requirement and to have rejected their past persecution claims based on their childhood experiences only because the harm they suffered at that time was too slight to rise to the level of persecution when compared to the harm suffered by the petitioner in Ordonez-Quino. Nor does the government argue otherwise in its briefing to us.
In so concluding, I recognize that, to show past persecution, the petitioners also must show that the harm that they suffered during the civil war-even if that harm is severe enough to constitute persecution and has a nexus to their Quiché identity-was attributable to the Guatemalan government. See Ly v. Mukasey, 524 F.3d 126, 132 (1st Cir. 2008). But neither the IJ nor the BIA made a finding that the petitioners had failed to make that showing. Thus, we may not sustain the rulings of the IJ and the BIA rejecting the petitioners' claims of past persecution as children on the basis of any such failure on the petitioners' part. And that is so even if, as the majority concludes, see Maj. Op. 176-77, substantial evidence supports the entirely distinct finding that the IJ made (and that the BIA affirmed) that the petitioners failed to meet their burden to show that the harm that they suffered as adults was not attributable to the Guatemalan government. See Maj. Op. 176. For that finding as to the responsibility of the Guatemalan government for events that occurred after the civil war simply does not bear on whether the government was responsible for events that occurred during the war itself.
In sum, given the severity of the harm that the petitioners credibly recounted that they experienced as children during the civil war, I cannot conclude that substantial evidence supports the IJ's and the BIA's decisions finding that the harm that the petitioners suffered-especially when considered from a child's perspective-was too insignificant to amount to past persecution. And, as the IJ and the BIA offered no other basis on which we may reject the petitioners' claims that their experiences as children during the Guatemalan Civil War constituted past persecution, I thus conclude that, in accord with SEC v. Chenery Corp., 332 U.S. 194, 67 S.Ct. 1760, 91 L.Ed. 1995 (1947), and *180 Aldana-Ramos v. Holder, 757 F.3d 9 (1st Cir. 2014), we should remand the petition.
That way, the BIA may consider in the first instance whether-given that the petitioners sufficiently demonstrated that the harm they suffered as children during the civil war was severe enough to constitute persecution-the petitioners have satisfied the nexus requirement with respect to those experiences and have otherwise shown what they must in order to support their claims that they suffered past persecution as children. For, if the petitioners can make a showing of past persecution based on their childhood experiences in the war, then for purposes of their withholding of removal claims, "it shall be presumed that the applicant's life or freedom would be threatened in the future[.]" 8 C.F.R. § 1208.16(b)(1)(i). And, in that event, their withholding of removal claims may be denied only if the government can show by a preponderance of the evidence, which the government has not yet purported to do, "that fundamental changes have occurred that have removed any threat to an applicant's life or freedom or that relocation to another part of the proposed country of removal would be safer and reasonable." Un v. Gonzales, 415 F.3d 205, 208 (1st Cir. 2005) ; see 8 C.F.R. § 1208.16(b)(1)(i).
I note in this regard that, as Ordonez-Quino recognized, the fact that, quite obviously, the civil war in Guatemala has ended is not in and of itself proof of a change in circumstances that would suffice to overcome the presumption of a well-founded fear of future persecution. Ordonez-Quino, 760 F.3d at 93 (noting that while the "guerrillas had been integrated into the government after the civil war and no longer engaged in militant activities" the record contained "significant documentation of ongoing systemic racism and human rights violations against the Mayan Quiché community"). Thus, we may not deny the petition for review with respect to the BIA's and the IJ's rulings rejecting the petitioners' withholding of removal claims based simply on the fact that it is clear that the civil war is over.
Moreover, the IJ and the BIA did not address whether, in the event that the petitioners demonstrated that they had experienced past persecution and were thus entitled to a presumption that they have a well-founded fear of future persecution, the government could overcome that presumption. Thus, issues concerning whether the government has put forth sufficient evidence to overcome a presumption of past persecution to which the petitioners may be entitled should be addressed in the first instance by the agency on remand, insofar as the agency concludes that the petitioners have met their burden of showing past persecution and thus are entitled to that presumption.
B.
I also conclude that we must remand the petition for further consideration of the sisters' separate contention that they suffered past persecution as adults and thus are entitled to withholding of removal. The petitioners credibly recounted that, while living in Guatemala in the late 1990s, members of a local gang repeatedly entered the store which Consuelo owned and at which Yolanda worked and harassed the sisters because of their Quiché ethnicity. The petitioners also credibly claimed that, one day during that period, gang members came into the store when both sisters were present, robbed the store, called the petitioners ethnic slurs based on their Quiché ethnicity, threatened to kill Consuelo, and threw a rock at Consuelo's head that struck her.
Consuelo's head injury was serious enough to cause a "severe hemorrhage." In fact, the resulting scar was still visible at the hearing before the IJ.
*181 Consuelo and Yolanda reported the incident to the police, and the perpetrators were arrested. Thereafter, however, Consuelo received another in-person death threat due to her role in the gang members' arrest, and she closed the store because of that threat and dropped the charges.
In 2001, moreover, after Consuelo had already come to the United States, Yolanda was attacked and threatened at a festival in Guatemala. The attacker, apparently mistaking Yolanda for Consuelo, grabbed Yolanda and said, "[t]riche [an ethnic slur for Quiché], I finally found you .... Did you really think that I was going to forget what you did to me? They sent me to jail for that." When bystanders informed the attacker that the woman that he had grabbed was Yolanda, not Consuelo, the attacker told Yolanda:
[Y]ou're going to be the one that's going to pay for it. Some people have told me that your sister's gone to the United States. But tell your sister that when she comes back, I'm going to be waiting for her here. And if not her, then I'll kill you. Tell her that if it's not going to be her, then I'll find you and I'll kill you.
Fearing for her life, Yolanda fled to the United States a few months later, as soon as her infant daughter was weaned.
There is no bright line rule as to when "the sum of an alien's experiences" rises to the level of persecution. Lopez de Hincapie v. Gonzales, 494 F.3d 213, 217 (1st Cir. 2007). But, the petitioners credibly recounted that they were jointly threatened with death by armed attackers at the store and that the assailants, because of the petitioners' Quiché ethnicity, threw rocks at the sisters and that one of the rocks seriously injured Consuelo. In addition, the death threat that Consuelo received after filing the police report was likewise specific and credible. In fact, in the wake of that threat, the petitioners closed their store and Consuelo ultimately fled the country. Finally, the threat that Yolanda received at the festival was also made in person, specific, accompanied by a forceful grab, and credible enough that she, too, fled the country shortly thereafter.
I thus cannot conclude that substantial evidence supports the IJ's and the BIA's rulings that the petitioners failed to meet their burden to show that, as adults, they were subject to harm severe enough to rise to the level of persecution.[5] We have held that "threats of murder ... fit neatly under this carapace [of persecution]." Id.; see also Un, 415 F.3d at 210 ("[C]redible verbal death threats may fall within the meaning of 'persecution.' "). And we have said that this is especially true where specific threats are "bolstered by violence," Javed v. Holder, 715 F.3d 391, 396 (1st Cir. 2013), and when the threats are made "in person, and with a weapon." Sok v. Mukasey, 526 F.3d 48, 54 (1st Cir. 2008).
In finding that the threats were not severe enough to support the sisters' claims of past persecution, the IJ did note that "the [petitioners] continued to live in Guatemala for a number of years without those attacks ever being fulfilled." But, evidence that the target of a death threat stopped pursuing justice against her attackers to avoid being killed by those same *182 attackers hardly supports the conclusion that the death threat was not severe enough to ground a claim of past persecution. Thus, the fact that Consuelo remained in the country after she was threatened is no indication that she did not have reason to fear for her life. See Lopez-Galarza v. I.N.S., 99 F.3d 954, 962 (9th Cir. 1996) (holding that the fact that "the petitioner remained in Nicaragua for eight years [after being attacked] ... [was] not relevant to ... her past persecution ... since that persecution had already taken place, and remaining did not lessen its severity"); see also Nakibuka v. Gonzales, 421 F.3d 473, 477 (7th Cir. 2005) ("[A]n asylum applicant's decision not to flee her home country immediately does not mean that she was not persecuted."); cf. Sok, 526 F.3d at 51, 54-56 (concluding that IJ's finding of past persecution was not supported by substantial evidence although the petitioner did not leave the country until four years after she first began receiving threats); Ajanel v. I.N.S., 79 Fed.Appx. 968, 969 (9th Cir. 2003) (concluding that unfulfilled death threats coupled with acts of violence against other members of the asylum seeker's social group constituted past persecution).
In fact, after Consuelo eventually did flee the country, the attackers still found Yolanda-mistaking her for Consuelo-and repeated the threat that they had given earlier. This time, though, the threat was made without any conditional caveat that might allow Yolanda to comply with it in a manner that would permit her to remain in the country without the death threat being carried out. And, in keeping with the petitioners' contention that these death threats were serious, Yolanda fled the country soon after this unconditional threat was given.
In my view, therefore, the key issue concerns the further finding that the IJ made and on which the majority relies to sustain the ruling by the IJ and the BIA that the petitioners had failed to show that they suffered past persecution. See Maj Op. 176-77. In that further finding, the IJ determined that, even assuming that the harm that the petitioners suffered as adults was severe enough to rise to the level of persecution, the petitioners still failed to demonstrate the requisite connection between the action or inaction of the Guatemalan government and that harm. And thus, the IJ ruled, their claims of past persecution failed for that independent reason.
The IJ's finding on that score relied on the fact that the petitioners testified that, "as soon as the police were informed" about the attack at the store, "they arrested at least some of [their] assailants and initiated criminal proceedings against them." The IJ recognized that-"given her fears at the time"-Consuelo's decision to drop the charges against those of her assailants who had been arrested "may have been a reasonable one[.]" But, the IJ nevertheless determined that Consuelo's decision to drop those charges "cannot be attributed to the Guatemalan government."
Although the majority concludes that substantial evidence supports this finding, see Maj. Op. 176, in my view, the IJ's reasoning in reaching this determination is unwarrantedly categorical. The IJ did not address the possibility that the record might contain evidence that would suffice to satisfy the petitioners' burden of showing that the government of Guatemala was not able (even if it was willing) to protect the petitioners from their attackers in the event that the sisters chose to pursue the charges against their attackers rather than to drop them in the face of threats.
The IJ did note that the petitioners testified that the police on a number of *183 occasions "actually assisted Consuelo in her efforts to ensure that the rights of other indigenous Mayan women were enforced and recognized by others[.]" But, that evidence of the government's willingness to provide assistance in the distinct context of addressing concerns about employment discrimination is simply one part of the record as a whole.
Thus, the IJ was required to weigh that evidence against any countervailing evidence that the petitioners put forward to show that the Guatemalan government was unable to protect them from the ethnically-motivated attacks and threats by the gang that attacked them. Of course, the government does not bear the burden of proving that it was not responsible for the harm to which the sisters were subjected by the gangs; the petitioners do. Pulisir v. Mukasey, 524 F.3d 302, 308 (1st Cir. 2008). And, the BIA is entitled to deference in evaluating the relative strength of any evidence that the petitioners put forth of the government's responsibility.
But, as the petitioners point out, they did put forth affirmative evidence of the Guatemalan government's inability to protect them in the form of evidence detailing the Guatemalan government's "long and disturbing history" of not protecting indigenous Guatemalans-and the Quiché in particular-from harm (and, indeed, of perpetuating such harm). And yet, as the petitioners also point out, neither the IJ nor the BIA addressed that evidence in connection with the petitioners' contention as to their past persecution claims that, in light of that disturbing history, the Guatemalan government could not protect the sisters from their attackers.
The failure of the IJ and the BIA to address this critical evidence precludes me from concluding that substantial evidence supports their conclusions that the petitioners failed to meet their burden to show that the Guatemalan government was responsible-if only through inaction-for the severe harm that they suffered as adults. In reviewing agency findings for substantial evidence, we are required to consider the record as a whole and not merely to consider that evidence in the record that lends support to the agency's finding. See Matovu v. Holder, 577 F.3d 383, 386 (1st Cir. 2009). And, thus, if there is potentially countervailing evidence in the record that the agency has simply not addressed in denying a claim for relief, then the appropriate course is to vacate and remand the petition for review so that the agency may consider that unaddressed evidence in the first instance. See Aldana-Ramos, 757 F.3d at 18 (determining that the failure of the BIA and IJ to "ever address" salient portions of the record "is insufficient" to permit its ruling to be sustained as supported by substantial evidence).
Thus, I conclude that we must vacate and remand the petition so that the agency may do what it has not yet done-assess and explain whether the petitioners' historical evidence satisfies their burden of showing that the Guatemalan government is responsible, even if only through inaction, for the severe harm that the petitioners suffered as adults. For, if the petitioners can meet that burden, and otherwise show what they must to establish that they were persecuted as adults, then they are entitled to a presumption that their "li[ves] or freedom would be threatened in the future." 8 C.F.R. § 1208.16(b)(1)(i). And the government would then be entitled to deny them withholding of removal only by overcoming that presumption, something that the government has not yet attempted to do.[6]
*184 II.
For the foregoing reasons, I respectfully dissent as to the petitioners' withholding of removal claims.

We explained in Lin v. Mukasey, 521 F.3d 22 (1st Cir. 2008), that, when the BIA determines that the IJ did not clearly err in making a finding without actually adopting the IJ's decision as its own, we potentially face a somewhat "metaphysical" question. Id. at 26 n.1. Do we review (presumably de novo) the BIA's legal conclusion that the IJ did not clearly err? Or do we review for substantial evidence the "underlying findings of facts themselves"? Id. But, we had no occasion to resolve that fine question of administrative law in Lin. See id. And we have no need to do so here either, as the parties agree that we should review the IJ's determination that the petitioners failed to meet their burden of showing past persecution for substantial evidence. Accordingly, like the parties, I focus on whether substantial evidence supports the IJ's finding that the petitioners failed to meet their burden to show past persecution.

The BIA issued a blanket ruling affirming the IJ's conclusion that the petitioners did not meet their burden to show that their past experiences rose to the level of persecution without separately discussing the petitioners' allegations of mistreatment as, respectively, children and adults. In issuing that blanket ruling, moreover, the BIA offered just one additional sentence that asserted in conclusory fashion that the harm described by the petitioners was not severe enough to rise to the requisite level. The BIA did append to that sentence a long string cite of supporting citations to our past precedents, but, in doing so, the BIA did not purport to engage in any meaningful way with the evidence that the petitioners put forth concerning the severity of the harm that they did suffer. Accordingly, I focus on the IJ's ruling as to past persecution, since if that ruling cannot be sustained as being supported by substantial evidence, then I do not see how the BIA's ruling that the IJ did not clearly err in finding that the harm the petitioners experienced was not severe enough to constitute persecution can be sustained either.

As discussed supra at note 2, the BIA did issue a blanket ruling affirming the IJ's conclusion that the petitioners did not meet their burden to show that their past experiences rose to the level of persecution. But, it did so without separately addressing the petitioners' claims based on their childhood and adult experiences. Thus, for the same reasons that I have set forth in that footnote, I focus on the IJ's ruling as to whether the petitioners suffered past persecution as adults, because, if that ruling cannot be sustained, then I do not see how the BIA's ruling upholding it can be.

In a paragraph that begins by holding that the IJ "did not clearly err in finding that the [petitioners] did not establish a well-founded fear of future persecution in Guatemala," the BIA did state that the IJ "correctly determined that [the petitioners] did not show that ... the government of Guatemala is unable or unwilling to protect them from the people that they fear." In so holding, the BIA determined that the IJ did not clearly err in finding that, because new Guatemalan police academies opening in "largely indigenous areas" would "increase the number of indigenous police officers," the petitioners had not met their burden of showing that they had a basis for fearing future persecution. That determination, though, did not purport to provide a basis for upholding the BIA and IJ's rulings rejecting the petitioners' claims of past persecution; nor did it address the issue of whether the government would be able to overcome a presumption of a well-founded fear of future persecution in the event that the petitioners demonstrated that they had experienced past persecution.