# United States Court of Appeals
## For the First Circuit

No. 16-2204

MANUEL SANTOS-GUAMAN,

Petitioner,

v.

JEFFERSON B. SESSIONS III,[*]
Attorney General of the United States,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Torruella, Thompson, and Kayatta,
<u>Circuit Judges</u>.

Kevin MacMurray and MacMurray & Associates, on brief for petitioner.
Virginia L. Gordon, Trial Attorney, Office of Immigration Litigation, Civil Division, United States Department of Justice, with whom Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Civil Division, and Leslie McKay, Senior Litigation Counsel, on brief for respondent.

May 23, 2018

---

[*] Pursuant to Fed. R. App. P. 43(c)(2), Attorney General Jefferson B. Sessions III has been substituted for former Attorney General Loretta E. Lynch, as the respondent.

**THOMPSON**, **Circuit Judge**.    Petitioner, Manuel Santos Guaman (Santos Guaman), seeks judicial review of a decision of the Board of Immigration Appeals (BIA) denying his asylum application.[1] Santos Guaman argues that the BIA erred when concluding that he had not suffered past persecution nor had a well-founded fear of future persecution if he returned to Ecuador on account of his indigenous Quiché ethnicity.  Before delving into his appeal, we will take a look back at Santos Guaman's childhood in Ecuador, what led him to come to the United States, and then ultimately what brought him before this Court.

### BACKGROUND[2]

Santos Guaman was born in Angus Gran Jesús, Ecuador, in 1986.  He is of indigenous descent and speaks Quichua--his native language.  Santos Guaman enrolled in school at the age of five; there, he wore traditional Quiché clothing and long hair.  While in school, Santos Guaman endured a great deal of abuse, discrimination, and harassment.  At recess, students chased him, punched him, stabbed him with pencils, threw stones at him, tried to whip him with electrical cords, and would "sometimes pull a bunch of hair . . . out of [his] head."  His teachers, in the

---

[1] Santos Guaman originally also applied for withholding of removal and protection under the Convention Against Torture Act, but has since abandoned both claims.

[2] These facts are elicited from Santos Guaman's hearing testimony, which the IJ found credible.

meantime, blamed him for (and participated in) the abuse, whipping him with a plastic cable on the hands, forcing him to stand "with [his] hands on the wall for long periods of time" and keeping him from eating lunch. The teachers made fun of him for not speaking Spanish and, like the students, did not countenance the traditional Quiché clothing he wore. They also punished him after observing the mistreatment he suffered--claiming it was his fault because he did not speak Spanish. Due to the abuse he was suffering, after completing just two years of studies, he abandoned school.

After dropping out at age 7, Santos sought work in his hometown and four other villages in an attempt to escape the ongoing mistreatment. Over the years, he worked as a bricklayer and a farmer. At different jobs, his bosses refused to pay him his full wage, and, along with his coworkers, harassed him for being Quiché. They also hurled threats of physical harm at him constantly.

Wanting to escape this abuse, at the age of 16[3] Santos Guaman decided to come to the United States. In January 2003, he entered through the Mexico-California border without inspection. Sometime after crossing the border, Santos Guaman traveled to Massachusetts where he took up residency. It appears he did not

---

[3] While Santos Guaman claims he was 18 when he first came to the United States, based on his December 1, 1986, date of birth and January 2003 entry into the United States, it appears he was 16.

come to the immigration authorities' radar until 2008 following a prosecution of a charge of operating a motor vehicle while under the influence in Massachusetts District Court.[4]  In December 2010, the Department of Homeland Security issued a Notice to Appear alleging Santos Guaman was removable from the United States pursuant to 8 U.S.C. § 1182(a)(6)(A)(i) (establishing removability for an alien who entered the United States without inspection or parole).  Santos Guaman admitted the truth of the allegations and conceded removability, but applied for asylum relief on the basis of his race, political opinion, and membership in a particular social group.

At his asylum hearing before the Immigration Judge (IJ), in addition to his own testimony and affidavit outlining the treatment he endured in Ecuador as a child, Santos Guaman submitted an affidavit from his psychologist, Kaye Cook, Ph.D., which outlined the doctor's clinical assessment of Santos Guaman and diagnosis of major depression with anxious features.[5]  Dr. Cook

---

[4] In December 2008, Santos Guaman agreed to a continuance without a finding in Massachusetts District Court to one count of operating under the influence, negligent operation, and unlicensed operation.  In August 2010, he pled guilty to operating a motor vehicle on a suspended license and in November 2013 he again pled to another suspended license charge as well as to operating without a license.

[5] According to Dr. Cook, Santos Guaman's mother was also abused:  Santos Guaman saw her "crying and bleeding" because "boys had thrown rocks at her," his family's crops and chickens were stolen, "the family dogs killed," and after Santos Guaman fled to the United States, his mother reported that some people "killed a

linked Santos Guaman's diagnosis to the harassment and abuse he suffered as a child. Specifically, Dr. Cook reported that even after Santos Guaman arrived in the United States, "he had nightmares about bad people in Ecuador who were coming after him. He was terrified to go out and avoided dark places because he was so scared . . . that he could not function." The events he suffered in Ecuador were "extremely psychologically disruptive."

In a bench decision, the IJ relied on Dr. Cook's affidavit to find that Santos Guaman was entitled to an exception to the one-year filing requirement for asylum applications (remember, Santos Guaman arrived in the United States in 2003 and only filed his asylum application in 2012 after removal proceedings had been initiated against him). The IJ found Santos Guaman's account of the mistreatment he suffered as a child to be credible, but nevertheless found that the discrimination did not rise to the level of persecution. The IJ noted that the Ecuadorian government was seeking to remedy the harm caused to indigenous communities, and that the Ecuadorian Constitution provides protections to indigenous persons. According to the IJ, because the Ecuadorian government was "making efforts to ease the discrimination of the indigenous people[,] . . . [a]t the very least [the government] cannot be accused of supporting the discrimination." The IJ

---

meat cow, and left the head and feet outside the door to shock and scare the family."

explained that while discrimination against indigenous communities in Ecuador was still prevalent, it was "not so pervasive and intolerable and either government directed or condoned as to be tantamount to persecution." For these reasons, the IJ denied Santos Guaman's asylum application and held that he had not established past persecution or a well-founded fear of future persecution. The IJ ordered him removed.

Santos Guaman appealed to the BIA, where the IJ's decision denying him asylum was affirmed. In its review, the BIA too acknowledged that Santos Guaman had endured a level of discrimination and bullying due to his indigenous background but ultimately held, as had the IJ, that the level of discrimination did "not rise to the level of past persecution" for asylum purposes. The BIA concluded that because Santos Guaman could not establish past persecution, he also could not avail himself of the presumption of future persecution (more on this to follow); and that he ultimately could not carry the burden of establishing the likelihood of future persecution as well. The BIA noted that evidence of the country conditions, while depicting that the indigenous community was discriminated against, also established that the community was granted the same civil and political rights as any citizen and received additional protection from the Ecuadorian Constitution. Therefore, the BIA also concluded Santos

Guaman could not establish a well-founded fear of future persecution were he to return to Ecuador.

This appeal ensued. Jurisdiction of this Court is pursuant to 8 U.S.C. § 1252.

## DISCUSSION

On appeal, Santos Guaman's argument is two-fold. First, he argues that both the IJ and BIA erred in concluding that he had not suffered past persecution in Ecuador. Second, he argues that they again erred when they concluded that he had not established a well-founded fear of future persecution on account of a protected ground (his being Quiché). We remand on the first issue raised by Santos Guaman.

### Standard of Review

Where the BIA "adopts portions of the IJ's findings while adding its own gloss," as is the case here, "we review both the IJ's and the BIA's decisions as a unit." Paiz-Morales v. Lynch, 795 F.3d 238, 242 (1st Cir. 2015) (internal quotation marks omitted) (quoting Renaut v. Lynch, 791 F.3d 163, 166 (1st Cir. 2015)). We apply a substantial evidence standard to administrative findings of fact, and will accept them "as long as they are supported by reasonable, substantial and probative evidence on the record considered as a whole." Singh v. Holder, 750 F.3d 84, 86 (1st Cir. 2014) (internal quotation marks and citation omitted). "[W]e will reverse only if the record is such as to compel a

reasonable factfinder to reach a contrary determination." <u>Jianli Chen</u> v. <u>Holder</u>, 703 F.3d 17, 21 (1st Cir. 2012); <u>see also</u> <u>Vasili</u> v. <u>Holder</u>, 732 F.3d 83, 89 (1st Cir. 2013).

Therefore, our review "is limited to determining whether substantial evidence in the administrative record supports the IJ's [and BIA's] findings that [Santos Guaman] neither suffered from cognizable past persecution nor demonstrated a well-founded fear of future persecution." <u>Lumaj</u> v. <u>Gonzales</u>, 446 F.3d 194, 198 (1st Cir. 2006). However, we review questions of law, including whether the IJ and BIA applied the correct legal standard, de novo. <u>Ahmed</u> v. <u>Holder</u>, 765 F.3d 96, 99 (1st Cir. 2014).

**Asylum**

To begin, let's take a look at the legal framework asylum seekers need to navigate to qualify for this form of relief (then we'll proceed to the facts of this case). Here's what you need to know: A petitioner may be eligible for asylum if he can demonstrate that he is a "refugee." 8 U.S.C. § 1158(b)(1)(A). A refugee, as defined by federal law and as relevant to this case, is a person who has either been persecuted or has a well-founded fear that, if he is returned to his home country, he will suffer persecution on account of a legally protected ground. <u>Id.</u> § 1101(a)(42)(A). These protected grounds include his "race, religion, nationality, membership in a particular social group, or political opinion."

Olujoke v. Gonzáles, 411 F.3d 16, 21 (1st Cir. 2005) (quoting 8 U.S.C. § 1101(a)(42)(A)).

"Persecution normally involves severe mistreatment at the hands of [a petitioner's] own government, but it may also arise where non-governmental actors . . . are in league with the government or are not controllable by the government." Ayala v. Holder, 683 F.3d 15, 17 (1st Cir. 2012) (quoting Da Silva v. Ashcroft, 394 F.3d 1, 7 (1st Cir. 2005)); see also Nikijuluw v. Gonzales, 427 F.3d 115, 121 (1st Cir. 2005) (persecution must be the result of the government's actions or inactions). The applicant bears the burden of proof and can establish persecution in one of two ways: (1) past persecution or (2) a well-founded fear of future persecution. Albathani v. INS, 318 F.3d 365, 373 (1st Cir. 2003); 8 U.S.C. § 1158(b)(1); 8 C.F.R. § 208.13.

If a petitioner can prove he suffered past persecution while in his home country, a presumption of future persecution follows. 8 C.F.R. § 208.13(b)(1); see Harutyunyan v. Gonzales, 421 F.3d 64, 67 (1st Cir. 2005). To rebut this presumption, the government is tasked with the burden of demonstrating by a preponderance of the evidence that either: (1) "[t]here has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution in the applicant's country of nationality"; or (2) "[t]he applicant could avoid future persecution by relocating to another part of the applicant's

country of nationality . . . and under all the circumstances, it would be reasonable to expect the applicant to do so." 8 C.F.R § 208.13(b)(1)(i)(A)-(B).

While an individual seeking asylum "bears a heavy burden," and faces a "daunting task" in establishing past persecution, Alibeaj v. Gonzales, 469 F.3d 188, 191 (1st Cir. 2006) (quoting Guzman v. INS, 327 F.3d 11, 15 (1st Cir. 2003)), a determination of whether an applicant suffered persecution is a fact-sensitive question determined on a case-by-case basis, see Sok v. Mukasey, 526 F.3d 48, 53 (1st Cir. 2008). We have required "the sum of [a petitioner's] experiences [to] add up to more than ordinary harassment, mistreatment, or suffering" to constitute persecution. Lopez de Hincapie v. Gonzales, 494 F.3d 213, 217 (1st Cir. 2007); Nikijuluw, 427 F.3d at 120 ("[P]ast persecution requires that the totality of a petitioner's experiences add up to more than mere discomfiture, unpleasantness, harassment, or unfair treatment."). The abuse must also "have reached a fairly high threshold of seriousness, as well as some regularity and frequency." Ivanov v. Holder, 736 F.3d 5, 11 (1st Cir. 2013) (quoting Rebenko v. Holder, 693 F.3d 87, 92 (1st Cir. 2012)).

Paramount to the case before us, "'age can be a critical factor' in determining whether a petitioner's experiences cross this [persecution] threshold." Ordonez-Quino v. Holder, 760 F.3d 80, 91 (1st Cir. 2014) (quoting Liu v. Ashcroft, 380 F.3d 307, 314

- 10 -

(7th Cir. 2004)).  In Ordonez-Quino, we explained that "[w]here the events that form the basis of a past persecution claim were perceived when the petitioner was a child, the fact-finder must 'look at the events from [the child's] perspective, [and] measure the degree of [his] injuries by their impact on [a child] of [his] age [ ].'"  Id. (alterations in original) (emphasis added) (quoting Hernandez-Ortiz v. Gonzales, 496 F.3d 1042, 1046 (1st Cir. 2007)). We proceeded to explain that the "harm a child fears or has suffered . . . may be relatively less than that of an adult and still qualify as persecution."  Id. (quoting Liu, 380 F.3d at 314).

## Severity of Mistreatment

Before us, Santos Guaman argues that his case should be analyzed "bearing in mind" that he was a minor during the time that he suffered the abuse, harm, and mistreatment in Ecuador-- something he claims the IJ and BIA failed to do.  We agree.  The IJ's decision makes no mention of the need to undertake a child-specific analysis, nor does it suggest in any way that it took Santos Guaman's age into account.  Similarly, the BIA's analysis also does not apply our child-specific standard for asylum claims despite the fact that Santos Guaman was a child during the mistreatment he endured, nor does it give reasoned analysis to support its finding that Santos Guaman was not persecuted. Instead, the BIA explained that some of the discrimination and abuse Santos Guaman faced as a child was because of his ethnicity.

- 11 -

Then, while correctly citing Ordonez-Quino and noting that the analysis applied to children's asylum claims differs from adult claims, the BIA proceeded to rely exclusively on cases applying the adult asylum standard for its conclusion that Santos Guaman had only shown "discrimination . . . [and] minor physical mistreatment," see Awad v. Gonzales, 463 F.3d 73, 76 (1st Cir. 2006) (being slapped in the face by army commander while petitioner was serving in the military, plus one incident of childhood bullying, did not amount to persecution of thirty-six-year-old petitioner under adult asylum standard); Nikijuluw v. Gonzales, 427 F.3d 115, 121 (1st Cir. 2005) (denying petition of incredible fifty-two-year-old whose asylum claim was unrelated to childhood); In Re A-M-, 23 I. & N. Dec. 737, 739 (BIA 2005) (analyzing and denying asylum claim under adult standard where petitioner was bullied as a child, but claim based on alleged persecution during adult years). Moreover, the BIA failed to provide any explanation as to why the facts Santos Guaman described in his (credible) testimony did not amount to persecution under the childhood standard.

It is clear to us that the IJ and the BIA erred as a matter of law in failing to apply the childhood standard. Accordingly, we deem it appropriate to remand this case to the BIA for it to apply the correct standard and decide, in the first instance, whether the abuse suffered by Santos Guaman constitutes

past persecution. See Aguilar-Escoto v. Sessions, 874 F.3d 334, 338 (1st Cir. 2017) ("The [BIA's] failure to apply the appropriate, purely objective standard to [the petitioner's] . . . claim provides an independent basis for remand.") (citing Kozak v. Gonzáles, 502 F.3d 34, 38 (1st Cir. 2007) (remanding because "the BIA applied an inappropriate legal standard"); Castañeda-Castillo v. Gonzales, 488 F.3d 17, 22 (1st Cir. 2007) (remanding "to allow the matter to be considered anew under the proper legal standards").

**Government Inaction**

Should the BIA find on remand that what Santos Guaman suffered in Ecuador, viewed from a child's perspective, "add[s] up to more than ordinary harassment, mistreatment, or suffering" and amounts to "severe mistreatment[,]" Ordonez-Quino, 760 F.3d at 87 (quoting Lopez de Hincapie, 494 F.3d at 217), it will need to decide whether the abuse Santos Guaman suffered was "government action, government-supported action, or government's unwillingness or inability to control private conduct," Nikijuluw, 427 F.3d at 120-21,--a requisite for a finding of past persecution.

Before the IJ, Santos Guaman argued that he had experienced past persecution on account of state inaction and that "his community's seriously abusive mistreatment is condoned by government officials responsible for enacting unfair legislation[] or at the least, permitted as demonstrated by their helplessness

- 13 -

or inability to protect victims."  According to an Ecuador 2013 Human Rights Report submitted by Santos Guaman, while "[t]he constitution prohibits discrimination based on race, gender, disability, language, or social status[,] [t]he government did not fully enforce these prohibitions . . . [and] indigenous persons . . . continued to face discrimination."  In its decision, the IJ acknowledged that the country report reflects that indeed indigenous persons continue to suffer discrimination at many levels of society, and it also noted all of the legal rights afforded to indigenous persons, including the right to hold title to land communally, manage reserves that the government set aside for biodiversity protection, and be consulted and participate in decisions regarding exploitation of non-renewable resources that are located on their lands and that could affect their culture or environment.  It further noted that the constitution "strengthens the rights of indigenous persons" and that the government has "established an Ombudsman's office for human rights which the constitution describes as an administratively and financially independent body under the transparency and social control branch of the government focused on human rights problems," before concluding that "[t]he thrust of the matter is that while there is discrimination in Ecuador the discrimination is not so pervasive and intolerable and either government directed or condoned such as to be tantamount to persecution."

- 14 -

Before the BIA, Santos Guaman again argued that while "[t]he Ecuadorian [C]onstitution prohibits discrimination on the basis of race or indigenous descent, [it] does not actively enforce this prohibition."  He argued that the Ecuadorian government "implicitly condones the harm [he] suffered."  The BIA, which expressed its agreement with the IJ's full ruling, never addressed this specific argument.  Instead, it affirmed the IJ's finding on past persecution (elaborating only on the IJ's severity ruling), summarized the rights articulated in the Ecuadorian Constitution pertaining to indigenous persons, and concluded that the mistreatment Santos Guaman suffered was not so severe to constitute past persecution.  On remand, we instruct the BIA to address Santos Guaman's argument that while the Ecuadorian Constitution vests indigenous persons with several rights, these rights are not actively enforced by the government.

## CONCLUSION

For the foregoing reasons, we **<u>VACATE</u>** the BIA's order dismissing Santos Guaman's appeal and remand for further proceedings consistent with this opinion.