# United States Court of Appeals
## For the First Circuit

No. 18-1202

DENNIS MAURICIO MIRANDA-BOJORQUEZ,

Petitioner,

v.

WILLIAM P. BARR,[*]
ATTORNEY GENERAL OF THE UNITED STATES,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before
Torruella, Lipez, and Kayatta,
Circuit Judges.

Rachel L. Rado and The Law Office of Rachel L. Rado, LLC on brief for petitioner.
Jennifer P. Levings, Senior Litigation Counsel, U.S. Department of Justice, Civil Division, Office of Immigration Litigation, Joseph H. Hunt, Assistant Attorney General, and Shelley R. Goad, Assistant Director, Office of Immigration Litigation, on brief for respondent.

August 27, 2019

[*] Pursuant to Fed. R. App. P. 43(c)(2), Attorney General William P. Barr is substituted for former Attorney General Jefferson B. Sessions III as respondent.

**TORRUELLA**, **Circuit Judge**.  Petitioner Dennis Mauricio Miranda-Bojorquez ("Miranda") fled his native El Salvador and entered the United States unlawfully.  He sought asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"), claiming that he was abused and threatened as a child by family and purported gang members in El Salvador.  The Immigration Judge ("IJ") denied Miranda's application for refugee status, and the Board of Immigration Appeals ("BIA") affirmed.  Because the agency's decision is supported by substantial evidence, we deny Miranda's petition for judicial review.

## I.

## A.

On November 22, 2014, at age seventeen, Miranda unlawfully entered the United States near Hidalgo, Texas, after which he was detained by border patrol and classified as an unaccompanied juvenile.  Miranda was later released to the custody of his parents, who lived in Chelsea, Massachusetts. On February 6, 2015, the Department of Homeland Security ("DHS") charged Miranda with removability, pursuant to section 212(a)(6)(A)(i) of the Immigration and Nationality Act ("INA"), as an alien present in the United States who has not been admitted or paroled.  In May of that year, he filed a timely application for asylum.

While in Chelsea, Miranda attended school and held jobs at restaurants. It was also in Chelsea, however, where he had two run-ins with the police. The first encounter took place on June 26, 2016. Miranda was riding in a car with three other individuals when the police stopped them after receiving a tip that individuals matching their description had been acting suspiciously in the area. During this stop, Miranda was subjected to a protective search and thereafter arrested for possession of a dangerous weapon, a large knife, in violation of a local ordinance.

Miranda's next encounter with the police resulted from a group altercation that occurred on September 23, 2016. Miranda was stabbed in the abdomen during this incident, after which he was transported to Massachusetts General Hospital for treatment. While Miranda was hospitalized, a Chelsea Police Department Officer, Anthony D'Alba, interviewed him. Miranda was under the effects of anesthesia and oxycodone at the time of this interview. Officer D'Alba filed a police report that detailed his interview with Miranda. The report stated that a woman had instigated the altercation. It explained that after Miranda and his friend ignored the woman's taunts, she summoned around a dozen of her friends, all alleged members of the 18th Street Gang. Upon arriving, the alleged gang members got into a scuffle with Miranda and his friend that eventually resulted in the latter two being

stabbed. The police report further reflects that during the interview Miranda stated that he was previously a member of MS-13 but was no longer involved with the gang.[1] Miranda also told Officer D'Alba that he still associated with and had friends who were members of MS-13.

On October 14, 2016, Homeland Security Investigations ("HSI")[2] designated Miranda as a verified and active member of MS-13. As a result, on November 17, 2016, DHS seized Miranda at his home and transferred him back to immigration custody.

**B.**

In a series of hearings beginning on July 14, 2017, an IJ considered Miranda's application for asylum, withholding of removal, and relief under the CAT.

Miranda testified that, as a child in El Salvador, he suffered a pattern of physical and psychological abuse at the hands of family members -- specifically, his uncle Mauricio and aunt Virginia -- with whom he lived after his parents left El Salvador

---

[1] MS-13 and the 18th Street Gang are rival gangs. The Government claims Miranda was arrested for "assault/attempted murder" as a result of the altercation. But the sections of the record the Government cites do not support this assertion.

[2] "HSI is a critical investigative arm of the Department of Homeland Security . . . ." Homeland Security Investigations, U.S. Immigration and Customs Enforcement, https://www.ice.gov/hsi (last visited Aug. 19, 2019).

for the United States. Specifically, Miranda testified that Mauricio beat him and forced him to do agricultural work and that Virginia singled him out, beat him, and abused him repeatedly, all because of his race.[3]

During the proceedings, the IJ also examined police reports -- including Officer D'Alba's -- and other government documents, such as those prepared by DHS, identifying Miranda as a gang member. After finding these documents admissible, the IJ allowed Miranda a "full opportunity" to rebut their reliability. Miranda then went on to testify that he had never told anyone that he used to be a gang member; that he had never associated with anyone belonging to a gang; and that he had "never been associated with any gang."

On August 25, 2017, the IJ issued a twenty-seven page opinion denying Miranda's application for refugee status and ordering his removal to El Salvador. The opinion lists all the documentary evidence that the IJ examined, including a memorandum of Miranda's "verified gang affiliation" based on the HSI database

---

[3] Virginia perpetrated these beatings with belts, broomsticks, and electric cords, and they were consistently accompanied by racial slurs referring to Miranda's dark complexion. Miranda was also deprived of food and medical care and forced to do agricultural work. His testimony further revealed that, out of all the children under Virginia's care, only those with dark skin received this treatment.

and other government sources, as well as the reports detailing his encounters with the Chelsea Police Department.

The IJ deemed credible Miranda's testimony about the abuse he experienced in El Salvador and found that Miranda faced past persecution on account of his race. Nonetheless, the IJ concluded that Miranda did not establish a well-founded fear of future persecution. The IJ made this determination in light of Miranda's testimony that his aunt Virginia is now deceased and the absence of evidence elsewhere in the record indicating that other actors would subject Miranda to similar mistreatment animated by racial animus.

The IJ also rejected Miranda's claim for asylum based on his belonging to a particular social group of "male minor children who are dependent and who cannot leave their families." According to the IJ, Miranda did not establish his membership in such a social group because he is no longer a minor and the record shows that he was in fact able to leave his family twice while living in El Salvador.[4]

---

[4] The IJ also rejected Miranda's claim that he was a member of a protected social group made up of "family members of individuals who have been executed by gang members" because they resisted gang membership. Miranda, however, does not seek our review of the agency's denial of asylum based on this proposed category.

Next, the IJ determined that Miranda was ineligible for humanitarian asylum. Critical to this determination was the IJ's adverse credibility finding with regards to Miranda's testimony about his gang affiliations in El Salvador and the United States. The IJ explained that "the record is dotted with inconsistent statements" about Miranda's connections to gangs in view of his testimony denying any involvement and the documentary evidence from multiple government sources revealing the contrary. This left the IJ "unable to discern the extent of [Miranda's] gang connections." Thus, despite finding that Miranda suffered past persecution, the IJ declined to exercise his discretion to grant humanitarian asylum because of the evidence showing that Miranda "associated with gang members and gang affiliates." Finally, the IJ found that Miranda's claim for withholding of removal failed because he could not meet the lower burden for asylum and that he did not show the requisite level of government involvement to access protection under the CAT.[5] Miranda thereafter appealed to the BIA, which dismissed his appeal and affirmed the IJ on February 5, 2018.

Miranda now seeks our review of the BIA's decision. He claims that the BIA erred in upholding the IJ's factual findings

---

[5] Miranda does not challenge the agency's denial of withholding of removal or relief under the CAT.

about his fear of future race-based persecution and his belonging to a protected social group. Miranda also challenges the agency's denial of humanitarian asylum. Specifically, he argues that it was an abuse of discretion for the IJ to deny him humanitarian asylum because of his purported gang affiliation. Lastly, Miranda contends that the agency violated his due process rights by relying on gang incident reports that he was unable to refute.

**II.**

Where, as here, the BIA embraces the IJ's decision but adds its own gloss, we review both decisions as a unit. Urgilez Méndez v. Whitaker, 910 F.3d 566, 569 (1st Cir. 2018); see also Aguilar-De Guillen v. Sessions, 902 F.3d 28, 32 (1st Cir. 2018). "Judicial review of the denial of asylum is deferential." Urgilez, 910 F.3d at 569 (citing 8 U.S.C. § 2152(b)(4)(B)). "[D]enial of asylum must be affirmed unless the administrative record unequivocally indicates error." Id. at 570 (citation omitted).

We will leave the agency's factual findings -- such as credibility determinations and whether persecution occurred because of a protected ground -- undisturbed so long as they are supported by substantial evidence. See Ordonez-Quino v. Holder, 760 F.3d 80, 87 (1st Cir. 2014); Jabri v. Holder, 675 F.3d 20, 24 (1st Cir. 2012). "Only where the record compels a contrary outcome

will we reject the IJ's findings." Aguilar-De Guillen, 902 F.3d at 32-33 (citing Thapaliya v. Holder, 750 F.3d 56, 59 (1st Cir. 2014)).

## A.

To obtain asylum, an applicant must establish that he qualifies as a refugee under section 101(a)(42)(A) of the INA. 8 U.S.C. §§ 1101, 1158. A refugee is someone who is "unable or unwilling" to return to his country of origin "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." Id. § 1101(a)(42)(A). If a petitioner proves past persecution, "a presumption of future persecution follows." Santos-Guaman v. Sessions, 891 F.3d 12, 17 (1st Cir. 2018). The Government, however, may rebut this presumption by showing either a fundamental change in circumstances that eliminates the fear of persecution or the reasonable expectation that the applicant can avoid future persecution by relocating within the country. Id. (citing 8 C.F.R. § 208.13(b)(1)(i)(A)-(B)).

We first direct our attention to the argument that it was an error for the BIA to affirm the IJ's factual findings that Miranda does not belong to a particular social group and that he will not face race-based persecution if repatriated to El Salvador.

We conclude that it was not, as substantial evidence supports both determinations.

As noted before, Miranda claimed membership in a "particular social group" made up of "male minor children dependent on and who cannot leave their families." But the IJ found that Miranda did not belong to such a group because he is no longer a minor and is neither dependent on his family nor unable to leave it. Nothing in the record contradicts the IJ's findings. It is unquestionable that Miranda is now twenty-one years old, a fact that means he is no longer in his purported social group of "minor children." Moreover, the record presents evidence that Miranda was able to leave his abusive family members, even as a minor in El Salvador. Miranda, for instance, escaped from the abuse he suffered at the hands of his aunt Virginia by choosing to go live with another aunt. Thus, there is substantial evidence in the record that supports the IJ's finding, affirmed by the BIA, that Miranda was not a member of the social group he invoked to seek asylum.

The IJ did find that Miranda established past persecution on the basis of his race, thus entitling him to a presumption of a well-founded fear of future persecution. The agency determined, however, that the Government successfully rebutted this presumption by demonstrating that the circumstances

leading to Miranda's past persecution in El Salvador have fundamentally changed because of the death of his aunt Virginia. See Uruci v. Holder, 558 F.3d 14, 19 (1st Cir. 2009) ("The presumption can be rebutted, however, if 'a report demonstrates fundamental changes in the specific circumstances that form the basis of a petitioner's presumptive fear of future persecution.'" (quoting Chreng v. Gonzáles, 471 F.3d 14, 22 (1st Cir. 2006))). And Miranda does not allege a fear of race-based persecution by any other parties. Here again, we spot nothing in the record to justify overturning the IJ's finding.

Under the applicable deferential standard of review, we conclude there is substantial evidence to support the IJ's findings -- accepted by the BIA -- that Miranda is no longer a member of his proposed social group composed of minors and that circumstances in El Salvador have sufficiently changed so as to render his fears of future persecution unfounded.

**B.**

We now shift our focus to the agency's denial of humanitarian asylum, which Miranda contends was also erroneous.

Even if the Government rebuts the presumption of future persecution -- like it did here -- the immigration courts retain the discretion to award asylum for humanitarian reasons to an applicant who has suffered past persecution. See Martínez-Pérez

v. Sessions, 897 F.3d 33, 42 (1st Cir. 2018); see also Ordonez-Quino, 760 F.3d at 94. "To qualify for humanitarian asylum based on the severity of past persecution, an applicant must prove that he experienced extraordinary suffering in the past. In other words, an [applicant] must show past persecution so severe that repatriation would be inhumane." Ordonez-Quino, 760 F.3d at 94 (alteration in original) (internal quotation marks omitted) (citation omitted); see also Precetaj v. Holder, 649 F.3d 72, 77 (1st Cir. 2011) ("[T]he paradigm case is one in which so much abuse has been directed against the victim that the suffering is projected into the future and that a return of the applicant to the place where the harm was inflicted would magnify the prior suffering."). This is a "last-resort form of relief that is difficult to obtain and rarely granted." Precetaj, 649 F.3d at 78. Here, the IJ denied humanitarian asylum after concluding that the hardship Miranda might face if returned to El Salvador was overcome by evidence of his involvement with gangs and gang members.

Miranda asks that we overrule the denial of humanitarian asylum because the agency's decision was informed by "erroneous, unauthenticated, prejudicial, and impermissible speculative evidence." He takes particular issue with the police and other government reports considered by the IJ that indicated his

-12-

association with MS-13 and its affiliates.  Among other things, Miranda insists that the police reports contain hearsay, present inconsistencies "that at least cast suspicion on their reliability," and that such inconsistencies should have led the IJ "to wonder if the [police officers] had ulterior motives when preparing them."  According to Miranda, his own testimony -- that he was under the effects of anesthesia in a hospital bed when he told the police about his past affiliation with MS-13 -- "casts suspicion on the narratives in the police report."  Miranda also uses the alleged unreliability of these reports to challenge the IJ's refusal to deem credible his testimony denying gang involvement.

Nothing in the record compels us to find that the police and other government reports were so obviously unreliable as to render the agency's reliance on them an abuse of the agency's wide discretion.  See Conde Cuatzo v. Lynch, 796 F.3d 153, 156 (1st Cir. 2015) ("Immigration judges have broad discretion over the conduct of immigration court proceedings.").  Here, not only did the IJ find the reports reliable and that their use would not be fundamentally unfair, but he also gave Miranda an opportunity to rebut their reliability.  This is exactly what our precedents required the IJ to do.  See, e.g., Arias-Minaya v. Holder, 779 F.3d 49, 54 (1st Cir. 2015) (upholding admissibility of police

report after the agency determined its reliability and fairness and offered petitioner "an opportunity to challenge its veracity and refute its contents").

As we recently reiterated in Cabas v. Barr, since the rules of evidence do not apply in immigration proceedings, the evidentiary standards deployed by immigration judges "are generally more lax." 928 F.3d 177, 184 (1st Cir. 2019) (citing Castilho de Oliveira v. Holder, 564 F.3d 892, 897 (7th Cir. 2009)). This means, for instance, that -- when considering discretionary decisions like whether to grant humanitarian asylum -- immigration judges can review police reports containing hearsay, "even if an arrest did not result in a charge or conviction, because the report casts probative light on [the applicant's] character." Mele v. Lynch, 798 F.3d 30, 32 (1st Cir. 2015). Similarly, authentication in the immigration context "requires nothing more than proof that a document or thing is what it purports to be," and it is undisputed that such a requirement was fulfilled here. Cabas, 928 F.3d at 184 (citing Yongo v. INS, 355 F.3d 27, 30-31 (1st Cir. 2004)). A presumption of regularity also attaches to the reports that Miranda contests, and he was unable to rebut that presumption with clear evidence. See Tota v. Gonzáles, 457 F.3d 161, 168 (1st Cir. 2006) ("[I]n the absence of clear evidence to the contrary, courts presume that [government agencies] have properly discharged their

-14-

official duties." (alterations in original) (quoting <u>United States</u> v. <u>Armstrong</u>, 517 U.S. 456, 464 (1996))).

The IJ's decision not to grant humanitarian asylum was in any event further informed by evidence other than the government reports. In the almost three full pages that his twenty-seven page opinion dedicated to this claim, the IJ notes that he also accounted for the testimony of a school counselor and Miranda's sister as "negative factors" suggesting his involvement with gangs and thereby weighing against the grant of humanitarian asylum.[6] Conversely, the IJ considered a myriad of "humanitarian factors" that favored the grant of asylum to Miranda. These included Miranda's history of "suicidal ideations, depression, as well as symptoms" of PTSD; the "thoughts of hopelessness" that he expressed to a social worker; the medical complications that he experienced as a result of the abuse and neglect he suffered in El Salvador; and his ties to immediate family living in the United States. This comprehensive weighing of factors lead the IJ to acknowledge that "[t]he removal of an individual who suffers from ongoing mental and physical health is a challenging one" and that Miranda's "removal to El Salvador will place a hardship on him and his

---

[6] The IJ further noted that Miranda did not attempt to rebut his sister's negative testimony by calling her as a witness, even though she was available to testify.

health."  After considering all available evidence, the agency nonetheless remained "unpersuaded that [Miranda] will refrain from gang affiliations that pose a danger to the community at large" and declined to grant him humanitarian asylum.

The abuse that Miranda experienced in El Salvador was undoubtedly deplorable.  But we conclude that substantial evidence supports both the agency's finding of adverse credibility with regards to Miranda's gang-affiliation testimony and the decision to withhold humanitarian asylum.[7]  Cf. Cantarero v. Holder, 734 F.3d 82, 86 (1st Cir. 2013) (noting that "Congress did not mean to grant asylum to those whose association with a criminal syndicate has caused them to run into danger").

## III.

Finding that substantial evidence supports the findings of the immigration court, we deny Miranda's petition for judicial review.

**Denied.**

---

[7]  Miranda also argues that the agency's consideration of the government reports affiliating him with gangs violated his right to due process under the Fifth Amendment.  In the immigration context, "[t]o make out a due process violation, a claimant must show that a procedural error led to fundamental unfairness as well as actual prejudice."  Conde Cuatzo, 796 F.3d at 156.  Having discerned no procedural error, we need not entertain this argument any further.